UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ORA K. EATMON, | ) | Case No. 1:07 CV 1636 |
| | ) | |
| Plaintiff, | ) | Judge Christopher A. Boyko |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Ora K. Eatmon appeals for judicial review of the decision of the Commissioner denying disability insurance benefits and supplemental security income under 42 U.S.C. §405(g) and its counterpart 42 U.S.C. §1383(c)(3).  Eatmon is a younger individual suffering from asthma, hemangioma of the liver, depressive disorder and borderline intellectual functioning. (Tr. 631). Despite these impairments, an ALJ found that Eatmon was a malingerer who could perform light work with asthma-related environmental restrictions further reduced by mild to moderate limitations  in ability to understand, remember and follow instructions, concentrate and pay attention, and moderately tolerate stress. (627-28, 631). Based on vocational expert testimony, Eatmon was found to be capable of such unskilled jobs as cashier, packer inspector, sales attendant and other office positions.

Eatmon challenges this conclusion raising two contentions: first there was a failure to follow the agency's own rules in rejecting the opinions from Dr. Haar and Dr. Frantz; and, second, there was error in failing to find Eatmon's mental condition met or equaled §12.05C of the Listing of Impairments of Appendix 1.

1:07CV1636                                    2

*Standard of Review:*

The issues before this court must be resolved under the standard whether there is substantial evidence in the record to support the Commissioner's decision.   Substantial evidence is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *Casey v. Secretary of Health & Human Services*,   987 F.2d 1230, 1233 (6th Cir. 1993);   *Wyatt v. Secretary*, 974 F.2d 680, 683 (6th Cir. 1992); *Born v. Secretary*, 923 F.2d 1168, 1173 (6th Cir. 1990); and see *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (court may "not inquire whether the record could support a decision the other way").


*Sequential Evaluation and Meeting or Equaling the Listing of Impairments:*

There is a requisite form of analysis to fulfill at the final stages of administrative review known as the five-step sequential evaluation process. This evaluation begins with the question whether the claimant is engaged in substantial gainful activity and then at the second step whether there is a medically severe impairment.   See §404.1520(a)(4)(I) and (ii) and §416.920(a)(4)(I) & (ii). At the third step of a disability evaluation sequence the issue is whether the claimant has an impairment which meets or equals a listed impairment from the Listing of Impairments of Appendix 1.   See 20 C.F.R. §404.1520(a)(iii) and (d); §416.920(a)(iii) and (d).   If an impairment exists which meets the description from the listing or is its equivalent, the claimant is deemed disabled at that point without consideration of age, education or prior work experience.   See *Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Once a claimant has met this burden that ". . . his impairment matches or is equivalent to a listed impairment, he is presumed

1:07CV1636                                        3

unable to work and is awarded benefits without determination whether he can perform his prior work or other work.").“At the fourth step of the sequential approach described in 20 C.F.R. §404.1520, it is the claimant's burden to show that [he] is unable to perform [his] previous type of work.”  *Dykes ex rel. Brymer v. Barnhart*, 112 Fed. Appx. 463, 467, 2004 WL 2297874, at *3 (6th Cir. 2004)); *Studaway v. Sec'y of Health and Human Services*, 815 F.2d 1074, 1076 (6th Cir. 1987).Once the administrative decision-maker determines that an individual cannot perform past relevant work, then the burden of going forward shifts to the Commissioner at the fifth step to demonstrate the existence of types of employment compatible with the individual's disability. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Ellis v. Schweiker*, 739 F.2d 245 (6th Cir. 1984); *Cole v. Secretary*, 820 F.2d 768, 771 (6th Cir. 1987); *Abbott v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990). The Commissioner concluded that Eatmon was no longer able to perform her past relevant work, so the burden shifted to the Commissioner to establish that Eatmon was capable of substantial gainful activity that was available in significant numbers. See 20 C.F.R.§404.1572, 416.972; 42 U.S.C.§423(d)(1)(A),§ 1328c(a)(3)(A) (Substantial gainful activity), 42 U.S.C. §423(d)(2)(A), §1328c(a)(3)(B)(significant numbers).

1:07CV1636                                4

*Opinions from Treating Physicians:*

The uncontradicted opinion from a treating physician is entitled to complete deference. See *Shelman v. Heckler*, 821 F.2d 316, 320 (6th Cir. 1987); *Jones v. Secretary of Health & Human Serv.*, 964 F.2d 526 (1992).   As *Wilson v. Commissioner* instructs, the ALJ must give the opinion from the treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Id.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §404.1527(d)(2) and §416.927(d)(2).   However,   reversal is required when in rejecting a treating physician's opinion failed to give "good reasons" for not giving weight to that opinion. See *Wilson v. Commissioner of Soc. Sec.*   378 F.3d 541, 544 (6th Cir. 2004).   This requirement for articulated "good reason" has been long recognized since at least SSR Rulings 96-2p and 96-5p, which require the ALJ to articulate specific legitimate reasons supported by substantial evidence in the record that are sufficiently specific to make clear to subsequent review as the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. Supportability is fairly obvious to determine if it is based on the laboratory findings and medical signs. Consistency is simply consistency "with the record as a whole." Supportability of the medical opinion of disability has long been a key factor in determining how much weight to give the opinion.   The ALJ is not bound by a conclusory opinion which is unsupported by detailed objective criteria, or when there is substantial medical evidence to the contrary.   *Cutlip v. Secretary*, 25 F.3d 284, 286 (6th Cir. 1994); *Cohen v. Secretary*, 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The regulatory scheme under §404.1527(d)(2) and its SSI counterpart §416.927(d)(2) require that the treating physician's opinion must be "well-supported by medically

acceptable clinical and laboratory diagnostic techniques." This includes reporting : (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). The ALJ *must* apply the regulatory factors of this section when explaining why the treating source was not accorded controlling weight. *Bowen v. Commissioner of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007), citing *Wilson*, 378 F.3d at 544. The ALJ also must consider the medical opinions "together with the rest of the relevant evidence." See 20 C.F.R. §§ 404.1527(b), 416.927(b).

In 2001 and 2002 Dr. Frantz reported that Eatmon had asthma, uterine fibroid tumors, depression, chronic injuries secondary to domestic violence, and gastro esophageal reflux disease. (Tr. 146, 154, 166). In 2001, based on an examination from December 19, 2000,  sitting and standing were both rated as normal  and all other physical activities including walking, bending and carrying were rated as fair. (Tr. 155). A more detailed quantitative report, identifying the December 19, 2000 examination, placed no limits on sitting but stated stand/walking was restricted to 6 hours of the workday at two hour intervals. (Tr. 167). Also Eatmon reportedly could lift/carry up to 25 pounds occasionally and 20 pounds frequently (*Id.*). Moderate restrictions against push/pulling, bending  and reaching were also noted. (*Id.*). Dr Frantz concluded that Eatmon was "unemployable." (Tr. 167)

The following year based on an examination of November 30, 2001, Dr. Frantz reported that Eatmon could lift and carry only five pounds frequently and ten pounds occasionally (Tr. 158).The doctor also found marked limitation from push/pulling and moderate limitation from

1:07CV1636                                    6

bending. Standing/walking were now limited to half-hour intervals limited to 3 hours in a workday. (Tr. 158)  Aside from repeating the same diagnoses, Dr. Frantz explained that these restrictions were based on an interview with Eatmon and that she said she became short of breath easily and could not carry groceries past 20 feet. (Tr. 158). He again concluded that Eatmon was "unemployable." (Tr. 158).   In 2002 Dr. Frantz rated sitting as normal, but standing was now rated fair, and bending, lifting and carrying were downgraded from fair to poor. Dr. Frantz' findings were lower back pain, but normal gait,  normal muscle strengths, and normal spinal ranges of motion (Tr. 148-49).


Dr. Frantz' opinion and residual functional capacities were rejected first, because the doctor rendered contrasting findings based on the same examination in 2001, and contrasting findings in 2002, and secondly his ratings were"too nebulous to be useful."(Tr. 626). Of the many valid reasons for discounting Dr. Frantz' opinions that the ALJ could have utilized, at least the first reason was valid. The ALJ may discredit a treating physician's opinion when there have been conflicting unsupported changes in the claimant's residual functional capacity. See *Stanley v. Department of Health and Human Services*, 39 F.3d 115, 118 (6th Cir. 1994); *Boggle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993).   20 C.F.R. §404.1527(d)(4); §416.927(d)(4). The Commissioner argues that the two sets of findings based on the December 2000 examination were "dramatic" in their extremes. This is an overstatement. The light work indications of the residual functional capacity and the commensurate ratings of normal and fair abilities were not diametrically opposed. However, the ALJ's reference to the inconsistency between those ratings

1:07CV1636                                   7

and the subsequent ratings of 2002 was a valid reason. There was an unsupported change in

Eatmon's residual functional capacity.


At this juncture, the issue becomes whether the ALJ fulfilled the duty to "clearly articulate

the reasons underlying [her] decision to give a medical opinion a specific amount of weight."

*Meece v. Barnhart,* 192 Fed.Appx. 456, 461, 2006 WL 2271336, *5 (6th Cir. 2006); *Wilson v.

Comm'r of Soc. Sec.*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(d)(2) and §416.927(d)(2). In

discussing the degree of clarity required, the court in *Wilson* explained:

> A Social Security Ruling explains that, pursuant to this provision, a decision
> denying benefits "must contain specific reasons for the weight given to the treating
> source's medical opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to any subsequent reviewers the weight the
> adjudicator gave to the treating source's medical opinion and the reasons for that
> weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (1996). "The requirement of
> reason-giving exists, in part, to let claimants understand the disposition of their
> cases," particularly in situations where a claimant knows that his physician has
> deemed him disabled and therefore "might be especially bewildered when told by
> an administrative bureaucracy that she is not, unless some reason for the agency's
> decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The
> requirement also ensures that the ALJ applies the treating physician rule and
> permits meaningful review of the ALJ's application of the rule. See *Halloran v.
> Barnhart,* 362 F.3d 28, 32-33 (2d Cir.2004).

*Wilson v. Commissioner of Social Sec.* 378 F.3d at 544 -545.


The ALJ's stark reference to Dr. Frantz' ratings of "poor" were juxtaposed with his prior

findings from 2001. Although a little reading between the lines is required, it is not difficult to

discern the reason for rejecting Dr. Frantz' opinion.

1:07CV1636                                                  8


        Finally, as this ALJ stated referring to Dr. Frantz' note that Eatmon is "unemployable," the

ALJ   is responsible for determining whether the applicant is disabled.   20 C.F.R. §404.1527(e);

§416.927(e).   This determination may include both consulting and non-examining sources.   20

C.F.R. §404.1527(f); §416.927(f). Thus, the ALJ essentially accepted Dr. Frantz' original residual

functional capacity assessment in producing Eatmon's physical residual functional capacity and

rejected the subsequent   unexplained reductions to less than sedentary work capability for "good

reason."


        Turning now to Dr. Haar, the treating psychiatrist, Eatmon argues that   Dr. Haar indicated

that Ms. Eatmon would be markedly limited in her ability to:

        • Perform activities within a schedule, maintain regular attendance, and be
        punctual
        within customary tolerances;
        • Complete a normal workday and workweek without interruptions from
        psychologically based symptoms and to perform at a consistent pace without an
        unreasonable number and length of rest periods;
        • Interact appropriately with the general; public;
        • Accept instructions and respond appropriately to criticism from supervisors;
        • Travel in unfamiliar places or use public transportation;
        • Set realistic goals or make plans independently of others.
        (Tr. 310).

Dr. Haar also noted Ms. Eatmon was moderately limited in multiple areas, including her ability to

maintain attention and concentration, get along with others or sustain and ordinary routine without

special supervision. Id. In response to questions from the State agency, Dr. Haar noted he did not

feel that Ms. Eatmon would respond well to the pressures of the work setting, even where only

simple, routine, or repetitive tasks were involved. (Tr. 304).

The ALJ's analysis of Dr. Haar's opinion is short and is contained in one brief paragraph:

On April 13, 2001, Jay Haar, M.D., the claimant's treating psychiatrist, opined that the claimant is "markedly" limited in six areas of work activity, including maintaining regular attendance, completing a normal work, and responding appropriately to criticism. Other areas were "moderately" limited (Exhibit 6F, p.11). However, Dr. Haar's notes do not indicate that he performed formal mental status evaluations, only that he talked with the claimant. Furthermore, just three months prior to his opinion, and with no apparent change in the claimant's mental condition, Dr. Haar "encouraged (the claimant) to find a job as soon as possible . . . " (Exhibit 6F). For the limitations expressed, Dr. Haar appears to have based his opinion on the claimant's own statements, which are not credible. Consequently controlling weight cannot be given to Dr. Haar's opinion.

(Tr. 66).

There is no requirement that the psychiatrist perform "formal mental status evaluations" as the decision suggests. 20 C.F.R.§404.1527(d)(2) and its SSI counterpart §416.927(d)(2) require that the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques."   This includes reporting: (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)).   A medical advisor's opinion can be accepted over a treating physician's opinion, especially if it concerns interpretation of objective tests.   See 20 C.F.R. §404.1527(d)(3), §416.927(d)(3); SSR 96-6p.

Related regulations appearing in §404.1528(b) and §416.928(b) explain that, "laboratory findings are anatomical, physiological or psychological phenomena which can be shown by the use of medically acceptable laboratory techniques . . . includ[ing] . . .psychological tests."   Thus, as explained in *Blankenship*, the absence of substantial "objective" documentation is not sufficient grounds to reject psychiatric opinion:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment . . . consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine. . . In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [sic] in order to obtain objective clinical manifestations of medical illness . . . [W]hen mental illness is the basis of a disability claim, *clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field* of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.   (emphasis supplied).

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989); *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987), quoting *Libus v. Harris*, 526 F.Supp. 56, 60 (N.D. Cal. 1981).

The ALJ also discounted Dr Haar on the basis that his patient was not truthful. This reason to reject the medical opinion would be sensible if there was some demonstration that Eatmon was exaggerating or "faking bad" for her psychiatrist.  See *Williamson v. Secretary of Health & Human Servs.*, 796 F.2d 146, 149-50 (6th Cir. 1986) There is no evidence that Eatmon deceived the doctor on any matter. The treatment notes reflect the general nature of her conversations.

Nonetheless,   Dr. Haar encouraged his patient to find work. (Tr. 313).   On January 25, 2001, Dr. Haar noted Eatmon's unhappiness "about not having much to do and not working and gaining some weight."   The doctor charted," She was encouraged to find a job as soon as possible, so that she could get out every day. She admits that she has not done much getting out or moving around." (Tr. 313). Eatmon argues that this note was written when she unsuccessfully attempted to work at "Abraxas," and Dr. Haar's notes at that time did not reflect the failed work attempt. (Tr. 312, 796). The doctor, though , did chart this failed work attempt and commented on April 10, 2001, "Client is hopeful to be employed and said one job did not work out for her, which she thought she would have enjoyed, and that was quite surprising, because it was at Abraxas and it would not seem quite the location that a victim would want to place herself in."(Tr. 312).

1:07CV1636                                    11

These chart notes indicate that Dr. Haar did indeed encourage Eatmon to find a job, and the doctor did not conclude that Eatmon could not work based on a failed work attempt. Although Eatmon can certainly quibble over this point, but it clearly was reasonable for the ALJ to discount the doctor's conclusions in light of the inconsistency of his recommendation or encouragement to work. See *Ferguson v. Astrue,* 225 Fed.Appx. 719, 720, 2007 WL 870392, 1 (9th Cir.)(recommendation for vocational rehabilitation training); *Blue v. Halter,* 15 Fed.Appx. 406, 408, 2001 WL 312421, 1 (9th Cir.2001(same); *McDonald v. Barnhart,* 172 Fed.Appx. 692, 693, 2006 WL 758484, 1 (8th Cir.,2006)(physician had recommended that claimant have functional-capacity evaluation and try to work.). There was substantial evidence supporting the ALJ's decision not to give Dr. Haar's opinion controlling weight.[1] Consequently, the ALJ had substantial evidence, minimal as it was to reject the opinions from Drs. Frantz and Haar, and the ALJ provided "good reasons" in both instances.

---

[1] Eatmon also refers to Dr. Turkson in her briefing, but this doctor also stated on November 23, 2005, that Eatmon cannot go back to construction work but recommended retraining for secretarial, cashier or bank teller work. (Tr. 917).

1:07CV1636                                      12

*§12.05C of the Listing of Impairments:*

Eatmon contends that the ALJ failed to adequately address whether her impairments meet or medically equal §12.05C which begins with the requirement of an IQ test score in the range of 60 to 70. [2] Psychologist Dr. Schonberg administered the Wechsler Adult Intelligence Scale- III test to Eatmon on October 11, 2001 and the results were verbal IQ score of 68, performance score of 77 and full scale score of 70.(Tr 430). The lowest of these scores is used in conjunction with listing 12.05.See 20 C.F.R. Pt. 404, Subpt. P, App. 1 §12.00D(6)(c);  *Abbott v. Sullivan,*  905 F.2d 918, 925 (6th Cir.1990).  The burden to establish that a claimant meets or equals a listed impairment is upon the claimant.  *Land v. Secretary*, 814 F.2d 241, 244 (6th Cir. 1986); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

*Meeting this Listed Impairment:*

"For a claimant to show that his impairment matches a listing, [the claimant] must meet *all* of the specified medical criteria.   An impairment that manifests only some of those criteria, no matter how severely, does not qualify (emphasis in original)."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990); and see *Hale v. Secretary*, 816 F.2d 1078, 1083 (6th Cir. 1987).

---

[2] **12.05 Mental retardation**: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.. . . C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]20 C.F.R. Pt. 404, Subpt. P, App. 1

1:07CV1636                                              13


The Commissioner counters that Dr. Schonberg, who discovered Eatmon's low IQ scores

in a consultative psychological examination diagnosed borderline intellectual functioning, not

mental retardation.(Tr. 430). There is no legal basis to reject a claim under §12.05C simply due to

semantics. However, in order to meet the requirements of mental retardation the onset of "deficits

in adaptive functioning" must occur **before** age 22.   *Foster v. Halter,*   279 F.3d 348, 355 (6th Cir.

2001); *Daniels v.   Commissioner of Social Security*, 70 Fed. Appx. 868 (6th Cir. 2003).[3]


The ALJ had found precisely that Eatmon failed to establish the onset of mental retardation

prior to age 22, and rejected Eatmon's argument based on *Bilka, v. Comm'r of Soc. Sec.*,   that none

of the prior non-WAIS  IQ (Wechsler Adult Intelligence Scale) scores were acceptable test

scores. (Tr. 624).[4]   The regulation cited by Eatmon, however, indicates only a preference for

WAIS testing[5]  and in *Abbott v Sullivan*, 905 F.2d 918 (6th Cir. 1990), the court explained that

---

[3]   "It is unclear why Dr. Goeke checked off that box, but he had specifically indicated his belief that Plaintiff
was not mentally retarded, and we do not interpret his box-checking as a contrary acknowledgment. Most likely he
checked off that particular box for lack of a better option on the form. After all, there was no option for "[s]ignificantly
subaverage general intellectual functioning with deficits in adaptive behavior initially manifested after the
developmental period." At any rate, we generally require a claimant to meet this requirement through more definite
means, such as providing the Commissioner with scores from a test taken prior to the age of 22 or conclusions from an
evaluation performed before Plaintiff had turned 22, rather than through perfunctory box-checking. See *Foster*, 279
F.3d at 354-55 ("None of [claimant's] testing or evaluation was contemporaneous with her developmental period; she
was already 42 years of age when the first testing was performed in 1997."). No such findings are in the administrative
record, and Plaintiff does not suggest on appeal that such findings exist."

*Daniels v. Commissioner of Social Security,*   70 Fed.Appx. 868, 873, 2003 WL 21774004, 6 (6th Cir.2003)


[4]   Eatmon had argued ,"[f]or purposes of the listing only WAIS test scores are acceptable," citing *Bilka v.
Commissioner of Social Security*,   252 F.Supp.2d 472, 474 (N.D. Ohio 2002)


[5]   "Due to such factors as differing means and standard deviations, identical IQ scores obtained from
different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values

1:07CV1636                                    14

other tests were acceptable under the regulations but, "it would be necessary to convert the IQ to the corresponding percentile rank."   *Id.*, at 924. The ALJ also pointed out that under the corresponding regulations for child's SSI, §112.00D(14) states that "it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities." (Tr. 624). The ALJ noted that Eatmon received IQ test scores while in school ranging from 76.5 to 105 (Tr. 625). Eatmon counters that these scores were from the California Test of Mental Maturity, and there is no indication of what this test was designed to measure.   A recent court decision from our sister district stated that a medical advisor had explained that the California Test of Mental Maturity served more as a measure of achievement rather  than IQ. See *Williman v. Astrue,*  2008 WL 819271, 5 (S.D.Ohio).   Perhaps Eatmon is correct that the ALJ erred in making an apples-to-apples comparison. However, the ultimate obstacle to Eatmon's success in proving that her impairment met §12.05C of the Listing of Impairments is that she retains the burden to establish that she met this listing.   See *Land v. Secretary*, 814 F.2d at 244; *Moon v. Sullivan*, 923 F.2d at 1182.   Eatmon and the Commissioner can certainly quibble over whether the record supports the onset of "subaverage general intellectual functioning with deficits in adaptive functioning" prior to her attaining the age of 22, however Eatmon has that burden and her evidence fails to conclusively establish that the severity of her condition manifested itself during her youth.

---

from tests of general intelligence that have a mean of 100 and a standard deviation of 15; e.g., the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00D(6)(c)

1:07CV1636                                          15

*Equivalency to this Listed Impairment:*

This leads, though, to the more complex issue of equivalency to the listed impairment. Obviously, Eatmon has IQ test scores consistent with at least part of the definition of mental retardation. "A claimant can demonstrate that she is disabled because her impairments are equivalent to a listed impairment by presenting 'medical findings equal in severity to all the criteria for the one most similar listed impairment.'(emphasis in original)." *Foster v. Halter,* 279 F.3d 348, 355 (6th Cir. 2001), quoting *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The ALJ relied on numerous other factors from the record including: school records showing C's in science and writing, not D's or F's as would be expected; that poor grades could indicate a lack of studying and not just mild mental retardation, Eatmon independently completed her social security paperwork; she traveled to various parts of the county; she worked on manuscripts that she tries to sell to producers; she handles her own mail and finances; and none of her treating physicians have mentioned problems with comprehension. (Tr. 625).

Eatmon counters this reasoning is flawed and was rejected in *Brown v. Secretary of Health and Human Services,* 948 F.2d 268 (6th Cir.1991):

> On appeal, Mr. Brown challenges the District Court's finding that there is substantial evidence to support the ALJ's rejection of Mr. Brown's I.Q. scores. Claimant's full-scale I.Q. of 68 places him within the range of Listing 12.05 C. The Secretary, however, argues that Mr. Brown's I.Q. scores should be deemed invalid. The Secretary claims that a full-scale I.Q. score of 68 is inconsistent with Mr. Brown's functional abilities. In support of his argument, the Secretary points to the following facts: Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove. We do not deem these facts to be inconsistent with a valid test I.Q. of 68, and the Secretary offers no empirical evidence in support of this conclusion.(footnotes omitted). *Brown*, 948 F.2d at 269-270.

However, the ALJ included that Eatmon works on manuscripts that she tries to sell to producers. Eatmon argues that she had testified that she only partners with someone else to write manuscripts and attempts to help a friend broker manuscripts.(Tr. 720). Treatment notes from Dr. Haar's office, though, refer to Eatmon's promotional trips to California and that she had had "a very positive meeting on her manuscript." (Tr. 327, and see Tr. 306, 312, 315, 319, 325). The ALJ's conclusion that this was activity beyond the scope of Eatmon's IQ test results combined with the ALJ's reason for discrediting her provided substantial evidence to support the finding that Eatmon's alleged mental retardation was not equivalent to the listings. The ALJ thus rejected Dr. Schonberg's IQ test score results for lack of credibility and that the severe depression evidenced at the time skewed the results.(Tr. 625). Generally deference is afforded the credibility determination of the ALJ, and Eatmon's arguments provide no reason to depart from the general rule. See *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007); *Rogers v. Comm'r of Soc.Sec.* 486 F.3d 234, 247 (6th Cir. 2007); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Contrary to Eatmon's argument, evidence of record did suggest higher functioning.


### *CONCLUSION AND RECOMMENDATION*

The issues before this court must be resolved under the standard of whether the determination is supported by substantial evidence of record.    "Under 42 U.S.C. §405(g), the ALJ's findings are conclusive as long as they are supported by substantial evidence."  *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 851 (6th Cir. 1986) (stating that this court's review "is limited to determining whether there is substantial evidence in the record to support the

1:07CV1636                                  17

findings")."   *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001).    Based on the arguments presented, the record in this matter and the applicable law, the undersigned recommends that the Commissioner's determination denying disability insurance benefits and supplemental security income be affirmed as supported by substantial evidence.


s/James S. Gallas
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of mailing of this notice.   Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.   *See, United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).


Dated: August 29, 2008